IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION



**FILED**

FEB 2 5 2020

Clerk, U.S. District Court
District Of Montana
Missoula

THOMAS TOSDAL,

        Plaintiff,

vs.

NORTHWESTERN CORPORATION
AND DOES 1-5,

        Defendants.

CV 19–205–M–DLC

ORDER

## INTRODUCTION

Plaintiff Thomas Tosdal ("Tosdal") owns shares of stock of Defendant

NorthWestern Corporation ("NorthWestern" or "the Company"), a public utility

company serving Montana, South Dakota, and Nebraska. (Docs. 1 at 2; 24 at 7.)

Tosdal sued NorthWestern for declaratory and injunctive relief after it announced

its intention to omit his shareholder proposal ("Proposal") from its 2020 proxy

statement[1] and form of proxy (together, "Proxy Materials"). (Docs. 1; 21-9 at 2.)

Because NorthWestern intends to file the Proxy Materials on or about March 6,

---

[1] Public companies, like NorthWestern, publish and circulate a proxy statement in advance of
their annual shareholders meetings. The proxy statement includes information about items on
which shareholders are asked to vote. The statement "can also include shareholder proposals—a
device that allows shareholders to ask for a vote on company matters." *Trinity Wall Street v.
Wal-Mart Stores, Inc.*, 792 F.3d 323, 328 (3d Cir. 2015).

2020 (Docs. 19 at 6; 21-9 at 2), the Court set an expedited briefing schedule for the parties' cross-motions for summary judgment and heard arguments on February 20, 2020 (Doc. 17). Although the question is close, the Court finds that NorthWestern makes the stronger case and grants summary judgment in its favor. Consequently, the Court denies Tosdal's prayer for injunctive relief.

## BACKGROUND

Tosdal submitted his Proposal to NorthWestern's corporate secretary at the end of September 2019 for inclusion in its 2020 Proxy Materials, seeking a shareholder vote. (Docs. 1 at 3; 24 at 6; 29 at 3.) Along with the Proposal, Tosdal provided proof of his shareholder eligibility to make such a submission. (*Id.*; *see also* 17 C.F.R. § 240.14a–8(b) (providing in relevant part: "[y]ou must have continuously held at least $2,000 in market value, or 1%, of the company's securities entitled to be voted on the proposal at the meeting for at least one year by the date you submit the proposal").) NorthWestern does not dispute that Tosdal satisfied all procedural and eligibility requirements to include the Proposal in its Proxy Materials.[2] (Doc. 29 at 3.)

---

[2] Initially, NorthWestern identified two eligibility defects in Tosdal's submission. (*See* Doc. 1 at 3–4.) However, by the Company's admissions, Tosdal effectively cured them, and they are not at issue here. (Docs. 19 at 4; 24 at 14, n.2.)

Instead, NorthWestern intends to exclude the Proposal from the 2020 Proxy Materials based on its substance. (Docs. 19 at 7; 29 at 4.) The Proposal advocates the following resolution:

[T]he shareholders request Northwestern Corporation plan for the Northwestern Energy Company to cease coal fired generation of electricity from the Colstrip plant and replace that electricity with non-carbon emitting renewable energy and 21st century storage technologies with its own assets or from the market no later than the end of the year 2025, and to share that plan with the shareholders no later than the 2021 annual meeting.

(Doc. 1-1 at 2.) In its prefatory language, the Proposal supports the resolution by citing: the effects of human-caused climate change; the uncertain economic future of the Company's coal-fired electricity-generating units at the Colstrip Power Plant ("Colstrip") given various political, environmental, and legal factors; and the increasing availability of affordable clean energy technologies. (*Id.* at 1–2.) The Proposal blames Colstrip for the Company's carbon emissions and predicts that it may become a stranded asset when other partial investors in Colstrip flee. (*Id.*)

At oral argument, Tosdal explained that his Proposal strives to effectuate an "attitudinal change" in NorthWestern's corporate philosophy "concretely expressed in a plan." (Hr'g Tr. 22:16.) He further clarified that "all that's being sought is a written commitment of some nature to stop generating at Colstrip and going to renewables . . . [i]n five years." (Hr'g Tr. 26:24–27:3.) Tosdal's right to compel NorthWestern to insert his Proposal in the Proxy Materials turns on the

- 3 -

applicability of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. §

78n(a), and a shareholder proposal rule promulgated by the Securities and

Exchange Commission ("SEC" or "the Commission"), Rule 14a–8.[3]

While NorthWestern "has committed to reduce the carbon intensity of its

electric generation by 90 percent by 2045 from a 2010 baseline" (Doc. 24-1 at 15),

it nevertheless seeks to omit the Proposal from is Proxy Materials under the same

rule that supports Tosdal's right to include it (Doc. 24 at 6). Specifically, the

Company contends that the Proposal impermissibly interferes with a matter

relating to its ordinary business operations.[4] (Doc. 19 at 7–8.) NorthWestern's

Vice President of Supply and Montana Government Affairs, John D. Hines

("Hines"), represents that "the ongoing operation of Colstrip is necessary and

essential to [the Company's] providing reliable and economic electricity to its

customers[.]" (Doc. 24-1 at 21.) Hines asserts that the Proposal, if implemented,

would harmfully meddle in the "long-term resource planning [that] is a core

responsibility of NorthWestern's management." (*Id.*) After analyzing results from

economic and utility models, NorthWestern's resource planners have determined

---

[3] 17 C.F.R. § 240.14a–8.

[4] Both in its letter to the SEC's Division of Corporate Finance (Doc. 21-9 at 12) and in its
Answer (Doc. 19 at 7), NorthWestern cites an alternative rationale to support its intention to omit
the Proposal under the "false or misleading statement" exclusion, 17 C.F.R. §§ 240.14a–8(i)(3),
240.14a–9, based on factual assertions in four of the Proposal's prefatory clauses. However, the
Company clarifies that it "does not base its opposition to Plaintiff's motion for summary
judgment and for a preliminary injunction on these misstatements[.]" (Doc. 28 at 8, n.1.)

that "early plant retirements, especially of low-cost, baseload resources like Colstrip, are not in the best economic interest of its customers." (*Id.* at 18.) And, Hines asserts that shutting down Colstrip early would "imperil the ability of NorthWestern to provide reliable energy during periods of peak demand." (*Id.*) So, based on its assessment that the Proposal would interfere with its ordinary operations, and pursuant to Rule 14a–8(j), NorthWestern urged the Commission's Division of Corporate Finance ("DCF") to concur with its analysis and recommend no enforcement action based on its intent to exclude the Proposal from its Proxy Materials. (Doc. 21-9 at 3.)

Before DCF responded to NorthWestern's no-action request, Tosdal filed suit in this Court on December 23, 2019, seeking declaratory judgment that "NorthWestern [] has a legal duty [under the rule] to include the proposal in its next proxy statement for voting by the shareholders at the next annual meeting."[5] (Doc. 1 at 5.) Tosdal further sought preliminary and permanent injunctive relief to prevent NorthWestern "from excluding the proposal from the 2020 proxy statement and annual meeting." (*Id.* at 7.) On January 9, 2020, DCF staff notified NorthWestern that, in light of Tosdal's suit, it declined to state its view on the matter. (Doc. 19 at 5.)

---

[5] NorthWestern's 2020 annual shareholder meeting is tentatively scheduled for April 23, 2020. (Doc. 21-9 at 2.)

After the parties' cross-motions for summary judgment were fully briefed (*see* Docs. 20; 23), the Court heard oral argument on February 20, 2020.

## DISCUSSION

## I. JURISDICTION

The Court has subject matter jurisdiction of this case because it arises under the laws of the United States. 28 U.S.C. §1331. Specifically, Tosdal's claims are grounded in the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and SEC Rule 14a–8. NorthWestern admits that the Court has personal jurisdiction over it and that venue is proper in the District of Montana. (Doc. 19 at 2.)

## II. CROSS-MOTIONS FOR SUMMARY JUDGMENT

### A. Legal Standard

A court properly enters summary judgment if the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Therefore, when a party moves for summary judgment, he is alleging that there are no material facts at issue; however, it does not automatically follow that if both parties move for summary judgment, they agree that there are no material issues of fact. *See United States v. Curtis-Nevada Mines, Inc.*, 415 F. Supp. 1373, 1376 (E.D. Cal. 1976) (only issue construction of statute), *aff'd in part, rev'd in part on the merits*, 611 F.2d 1277 (9th Cir. 1980). "[W]hen parties submit cross-motions

for summary judgment, each must be considered on its own merits." *Fair Hous.*

*Council of Riverside Co., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir.

2001) (citations omitted). Still, "when the only issues to be decided in the case are

issues of law, summary judgment may be granted. For example, if the only issues

that are presented involve legal construction of statutes [or regulations] . . .

summary judgment [is] proper." 10A Charles Alan Wright et al., *Federal Practice*

*and Procedure*, § 2725 (4th ed. 2016).

In this case, the Court agrees with the parties' assessment that no material

factual disputes exist to preclude judgment as a matter of law.[6] (Docs. 26; 29; *also*

*see* Doc. 25 at 4 (stating that "[t]he legal battle to include the proposal in

NorthWestern's proxy materials is down to one issue: whether the 'management

function—ordinary business' exclusion" applies).) Summary judgment is proper

because the Court's decision rests solely on the construction of the applicable

regulation.

---

[6] In his Response to NorthWestern's Statement of Undisputed Facts, Tosdal lodges various objections based on his contention that NorthWestern's factual assertions are: (1) irrelevant to the instant cross-motions; and (2) either fully or partially untrue. (Doc. 26 at 3–7.) At oral argument, Tosdal clarified that neither his objection to Paragraph 53 of the Hines Declaration (Doc. 24-1 at 21) nor his factual disputes with Paragraphs 7, 9, 11, and 12 of NorthWestern's Statement of Undisputed Facts (*see* Doc. 26) preclude the Court's ability to rule on the narrow issue before it, which is the application of the "ordinary business" exclusion. The Court agrees to the extent that NorthWestern's assertions (Doc. 24-7)—and Tosdal's disputes with them (Doc. 26)—go to the merits of the Proposal itself, rather than to whether the ordinary business exclusion applies.

**B. The "ordinary business" exclusion applies to allow NorthWestern to omit the Proposal from its 2020 Proxy Materials.**

Section 14(a) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78n, "stemmed from the congressional belief that fair corporate suffrage is an important right that should attach to every equity security bought on the public exchange." *J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964) (citation and internal quotation marks omitted), *abrogated on other grounds as recognized by* 137 S. Ct. 1843 (2017). Among the Section's "chief purposes is 'the protection of investors,'" *id.*, which includes ensuring that shareholders are "enlightened not only as to the financial condition of the corporation, but also as to the major questions of policy, which are decided at stockholders' meetings." *Amalgamated Clothing and Textile Workers Union v. Wal-Mart Stores, Inc.*, 821 F. Supp. 877, 882 (S.D.N.Y. 1993) (quoting S. Rep. No. 792, 73rd Cong., 2d Sess. at 12 (1934)). To those ends, Section 14(a) renders unlawful the solicitation of proxies in violation of the SEC's rules and regulations, which are codified at 17 C.F.R. § 240.14a–1 et seq.

Accordingly, pursuant to its congressionally delegated task under Section 14(a) and to advance "corporate democracy," *Trinity Wall Street v. Wal-Mart Stores, Inc.*, 792 F.3d 323, 335 (3d Cir. 2015) (citations and internal quotation marks omitted), the Commission promulgated Rule 14a–8, also known as the

- 8 -

"shareholder proposal rule," in 1942. *See* Kevin W. Waite, *The Ordinary Business Operations Exception to the Shareholder Proposal Rule: A Return to Predictability*, 64 Fordham L. Rev. 1253, 1254 (1995). Rule 14a–8 generally requires companies "to place on management's proxy ballot, any proper proposal submitted by a qualifying shareholder." However, even when a shareholder is eligible and his proposal is procedurally proper, "under a few specific circumstances [a] company is permitted to exclude [the] proposal[,]" though the burden rests with company to demonstrate such an exclusion applies. 17 C.F.R. §§ 240.14a–8, 240.14a–8(g). Relevant here, a company may exclude a shareholder proposal from its proxy materials "if the proposal deals with a matter relating to the company's ordinary business operations." 17 C.F.R. § 240.14a–8(i)(7).

As a threshold matter, Tosdal argues that the ordinary business exclusion lacks ambiguity and therefore urges the Court to afford no deference to "external aids of interpretation." (Doc. 21 at 11.) In other words, Tosdal asks the Court to ignore the SEC's "past wanderings" and instead consider only the "text, structure, history, and purpose of the regulation, in all the ways it would if it had no agency to fall back on" to decide what "ordinary business" means. (*Id.* at 12.) Resolution of this preliminary issue bears on the Court's reliance on authorities that support its ultimate decision on the merits. So, before addressing the parties' substantive

arguments, the Court will first explain why it disagrees with Tosdal's assessment and finds the ordinary business exclusion to be genuinely ambiguous.

> **1. The subject matter of the ordinary business exclusion renders it genuinely ambiguous, and the Court applies *Auer* deference to the SEC's interpretive releases.**

"Want to know what a rule means? Ask its author." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2412 (2019). The doctrine of *Auer* deference directs courts to do just that—defer to an agency's construction of its own regulation "when interpreting [a] regulation involv[ing] a choice between (or among) more than one reasonable reading." *Id.* at 2411. *Auer* deference prescribes a rebuttable presumption that "the power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers." *Id.* at 2412 (quoting *Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. 144, 151 (1991)). Sympathetic to cries that *Auer* "bestow[ed] on agencies expansive, unreviewable authority," the Supreme Court recently clarified that "[t]he deference doctrine . . . is potent in its place, but cabined in its scope." *Id.* at 2408.

The scope of *Auer* deference is limited to interpreting regulations that are "genuinely ambiguous." *Id.* at 2414. That is, if the meaning of the words used are not in doubt, "there is no plausible reason for deference." *Id.* at 2415. The *Kisor* Court cautioned lower courts not to "jump[] the gun" in declaring a regulation ambiguous, and "insisted that a court bring all its interpretive tools to bear before

- 10 -

finding that to be so." *Id.* at 2423. To that end, courts must "make a conscientious effort to determine, based on indicia like text, structure, history, and purpose, whether the regulation really has more than one reasonable meaning." *Id.* at 2423–24. Still, and contrary to Tosdal's implication otherwise (Doc. 33 at 10), once a court exhausts the traditional tools of construction, *Kisor* left the *Auer* doctrine firmly in place: "we presume that Congress intended for courts to defer to agencies when they interpret their own ambiguous rules." *Id.* at 2414.

With the reinforced limits of *Auer* deference in mind and the traditional tools of construction in hand, the Court turns to the disputed rule: a company may exclude an otherwise proper shareholder proposal "[i]f the proposal deals with a matter relating to the company's ordinary business operations." 17 C.F.R. § 240.14a–8(i)(7). The Court cannot agree that the exclusion lends itself to only one reasonable reading. First, Tosdal contends that the "commonly understood meaning" of "ordinary" is unambiguous (Docs. 21 at 12; 25 at 10; 33 at 9), but the Court is unconvinced. Even the definition Tosdal advances—"with no distinctive features, normal or usual"—begs for clarity. What is a "distinctive feature"? Under whose version of "normal"? Where is the line between "usual" and unusual? The ambiguity of the word "ordinary," and the efforts to define it, "reflect[] the well-known limits of expression." *See Kisor*, 139 S. Ct. at 2410. The text provides no assistance to the Court in construing the rule.

Second, the structure of the exclusion similarly provides no help. Tosdal correctly points out that the Company bears the burden to show the exclusion applies. (Doc. 33 at 9.) However, the Court fails to see how, as a structural matter, the SEC's burden allocation helps to distinguish between "ordinary" and extraordinary business practices.

Third and fourth, the history and purpose of the governing regulation, aside from highlighting Congress's sweeping policy goals, fail to point the Court toward only one reasonable reading of the ordinary business exclusion. In 1934, "Congress entrusted to the SEC the prescription of rules and regulations governing proxy solicitations 'in the public interest or for the protection of investors.'" *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 421 (D.C. Cir. 1992) (quoting 15 U.S.C. § 78n(a)). With this directive, the SEC promulgated the shareholder proposal right in Rule 14a–8. *Id.* But, while the right "is financially advantageous [for the shareholder], it does not create an open forum for shareholder communication," as reflected in the rule's substantive exclusions. *Trinity Wall Street*, 792 F.3d at 336 (internal quotation marks and citation omitted). And, of those exclusions, the ordinary business exclusion has been called the "most perplexing," based on "the opaque term 'ordinary business' which is neither self-defining nor consistent in its meaning across different corporate contexts." *Id.* at 337.

Examining the history and purpose of the regulation, born from the SEC's interpretation of the philosophical mandate that it be "in the public interest or for the protection of investors," fails to clarify the opaque term "ordinary business." A narrow reading of the exclusion could advance "the public interest" by promoting the purest form of corporate democracy, as nearly all shareholder proposals would be welcomed to the floor for vote. On the other hand, a broad reading of the exclusion could serve to protect investors' interests by preventing the waste of money and manpower if a company were required to acknowledge each proposal in a cacophony of unfiltered shareholder voices. Either reading—narrow or broad—would be reasonable under the history and purpose of the regulation. The rule's muddiness leaves little wonder why, "from the beginning, Rule 14a–8 jurisprudence—both in quality and quantity—has rested almost exclusively with the SEC." *Trinity Wall Street*, 792 F.3d at 337 (citation omitted).

Regulations may be genuinely ambiguous for various reasons. *Kisor*, 139 S. Ct. at 2410. One reason for ambiguity is that "[t]he subject matter of a rule may be so specialized and varying in nature as to be impossible—or at any rate impracticable—to capture its every detail." *Id.* So the Court finds the subject matter of the regulation here. And, after bringing "all its interpretive tools to bear," the Court concludes that the ordinary business exclusion is genuinely ambiguous.

Still, as the *Kisor* Court explained, "we are not done—for not every reasonable agency reading of a genuinely ambiguous rule should receive *Auer* deference." *Id.* at 2416. Before applying the deference doctrine, "a court must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." *Id.* The Court points to three important markers for identifying when *Auer* deference is appropriate: "the regulatory interpretation must be one actually made by the agency"; "the agency's interpretation must in some way implicate its substantive expertise"; and the "agency's reading of a rule must reflect fair and considered judgment." *Id.* at 2416–18 (citations and internal quotation marks omitted).

Here, Tosdal concedes the character and context of the Commission's interpretive releases entitle them to controlling weight and, therefore, *Auer* deference. (Doc. 33 at 10.)[7] The Court agrees.[8] However, Tosdal takes issue with the weight—if any—the Court should afford to SEC Staff Legal Bulletins and "no

---

[7] Tosdal states that "the Court may look to the 1976 and 1998 SEC Releases to aid interpretation of the exclusion, should the Court find the exclusion to be genuinely ambiguous." (Doc. 33 at 10.) Based on his briefing and discussion at oral argument, his failure to reference the 1983 Release appears to be inadvertent.

[8] As the Court discussed in *Trinity Wall Street*:

Each of the SEC's interpretive releases was adopted after notice and comment and thus merits our deference. As the Supreme Court explained, "[j]ust as we defer to an agency's reasonable interpretation of the statute when it issues regulations in the first instance, . . . the agency is entitled to further deference when it adopts a reasonable interpretation of the regulations it has put in force."

792 F.3d at 337, n.9 (alteration in original) (citations omitted).

action" letters. (*See, e.g.,* Doc. 33 at 12.) He contends that persuasive authority "is just another way of saying deference," to which the Bulletins and letters are not entitled. (*Id.*)

*Trinity Wall Street* provides a less than firm, but adequate, touchstone on this issue. There, the Court disagreed with the view that these resources "hold any persuasive value," but gave them "careful consideration as representing the views of persons who are continuously working with the provisions of the statute [the regulation in our case] involved." 792 F.3d at 342, n.11 (citations omitted) (alteration in original). So, while the SEC "has consistently regarded the court, and not the agency, as the formal and binding adjudicator of Rule 14a–8's implementation of [S]ection 14(a)," the Court affords "due respect to the SEC's experience in attempting to carry out the large, but largely undetailed, charge that Congress . . . gave to the Commission." *Roosevelt*, 958 F.2d at 424–25. The Court recognizes that the distinction between "careful consideration" and "persuasion," too, will likely fail to reassure Tosdal that it will accord no persuasive weight to the Bulletins and letters. Nevertheless, the Court affirms that it will follow the approach taken by the Court in *Trinity Wall Street* as it relates to the letters and Bulletins. Its consideration of these materials is only that—consideration.

In sum, the Court finds the ordinary business exclusion genuinely ambiguous and applies *Auer* deference to the SEC's interpretive releases. The

Court takes the SEC Staff's Legal Bulletins and "no action" letters under consideration, but they hold no "power to persuade." *See Kisor*, 139 S. Ct. at 2414. The Court now reaches the merits the argument before it: whether NorthWestern may omit the Proposal from its Proxy Materials under the ordinary business exclusion.

> **2.** **Because the Proposal is too entwined with NorthWestern's day-to-day business, the Company may omit it from the 2020 Proxy Materials under the ordinary business exclusion.**

NorthWestern can exclude the Proposal from its Proxy Materials "if the [P]roposal deals with a matter relating to the [C]ompany's ordinary business operations." 17 C.F.R. § 240.14a–8(i)(7). Tosdal argues that the subject of the Proposal falls outside the ordinary business exclusion, because it "deals with a policy issue—whether to plan for future discontinuation of coal fired generated electricity at Colstrip in favor of renewables." (Doc. 21 at 12.) Therefore, he contends, the general rule applies, and NorthWestern must include the Proposal in its 2020 Proxy Materials. (Doc. 20 at 1.) NorthWestern responds that "the proposal is an attempt to micro[-]manage a resource planning decision and infringe upon [the Company's] ordinary business practices." (Doc. 24 at 6.) As such, the Company says, the Proposal falls squarely within the exclusion under Rule 14a–8. The Court agrees.

Through various rounds of interpretive releases, the SEC has provided guidance as to the basis for and proper application of the ordinary business exclusion. In 1976, the Commission recognized that the term "ordinary business operations" presented problems when it had been "deemed on occasion to include certain matters which have significant policy, economic or other implications inherent in them." Adoption of Amendments Relating to Proposals by Security Holders, Release No. 12,999, 1976 WL 160347, at *10 (Nov. 22, 1976) ("1976 Release"). Nevertheless, the SEC left the term untouched, but advised that it should be "interpreted somewhat more flexibly than in the past." *Id.* For example, a proposal that a power company not construct a nuclear plant should be considered outside the scope of a company's ordinary business, because the "economic and safety considerations attendant to nuclear power plants are of such magnitude that a determination whether to construct one is not an 'ordinary' business matter." *Id.* While the SEC concluded that its interpretation rendered the exclusion "more restrictive," it provided companies consolation that "where proposals involve business matters that are mundane in nature and do not involve substantial policy or other considerations, [the exclusion] may be relied upon to omit them." *Id.*

Under the more restrictive interpretative regime, the DCF staff refused to apply the exclusion where: (1) the proposal requested that the company prepare

- 17 -

and disseminate a report; or (2) the proposal requested a special committee be formed to examine a particular area of the business. Proposed Amendments to Rule 14a–8 Under the Securities Exchange Act of 1934 Relating to Proposals by Security Holders, Release No. 12,734, 1982 WL 600869, at *17 (Oct. 14, 1982) ("1982 Proposing Release"). Objections mounted that the staff's position—that companies do not prepare reports or form special committees as part of their ordinary business—erroneously "rais[ed] form over substance." *Id.* The Commission agreed, and in 1982, broadened the scope of the exclusion: "staff will consider whether the subject matter of the special report or the committee involves a matter of ordinary business[, and] where it does, the proposal will be excludable[.]" Amendments to Rule 14a–8 Under the Securities Exchange Act of 1934 Relating to Proposals by Security Holders, Release No. 20,091, 1983 WL 33272, at *7 (Aug. 16, 1983) ("1983 Adopting Release").

The Commission revisited the exclusion in 1998 to readopt a case-by-case approach to employment-related proposals, and took the opportunity to iterate:

The general underlying policy of this exclusion is consistent with the policy of most state corporate laws: to confine the resolution of ordinary business problems to management and the board of directors, since it is impracticable for shareholders to decide how to solve such problems at an annual shareholders meeting.

Amendments to Rules on Shareholder Proposals, Release No. 23,200, 1998 WL 254809, at *4 (May 21, 1998) ("1998 Release"). Two analytical considerations

support the exclusion's policy. *Id.* The first focuses on the proposal's subject matter: "[c]ertain tasks are so fundamental to management's ability to run a company on a day-to-day basis that they could not, as a practical matter, be subject to direct shareholder oversight." *Id.* Still, the SEC cautioned that proposals "focusing on sufficiently significant social policy issues" generally should not be excluded when they "transcend the day-to-day business matters." *Id.*

The second consideration examines "the degree to which the proposal seeks to 'micro-manage' the company by probing too deeply into matters of a complex nature upon which shareholders, as a group, would not be in a position to make an informed judgment." *Id.* at *5. The Commission explained that this consideration is relevant, for example, "where the proposal involves intricate detail, or seeks to impose specific time-frames or methods for implementing complex policies." *Id.* In response to claims that these examples sweep nearly all proposals within the exclusion, the SEC stated that such an implication is unintended: "[t]iming questions, for instance, could involve significant policy where large differences are at stake, and proposals may seek a reasonable level of detail without running afoul of these considerations." *Id.* After setting out the central considerations for analyzing the ordinary business exclusion, the Commission reaffirmed that "determinations will be made on a case-by-case basis, taking into account factors

- 19 -

such as the nature of the proposal and the circumstances of the company to which it is directed." *Id.*

Then-Circuit Judge Ginsburg's analysis in *Roosevelt* is helpful in determining whether application of the "most perplexing" Rule 14a–8 exclusion is appropriate here. *See Trinity Wall Street*, 792 F.3d at 337 (citation omitted). There, a proposal called for Du Pont to phase out production of chlorofluorocarbons ("CFCs") and to present a report to shareholders detailing efforts to find environmentally sound alternatives and marketing plans to sell them. *Roosevelt*, 958 F.2d at 417. The *Roosevelt* Court emphasized that the shareholder's disagreement with Du Pont's policy "is not about whether to eliminate CFC production or even whether to do so at once. The former is an end to which Du Pont is committed, and immediate cessation, before environmentally safe alternatives are available is not what Roosevelt proposes." *Id.* at 425.

Roosevelt unsuccessfully urged the Court to find her proposal outside the scope of the ordinary business exclusion by analogizing it to the nuclear power plant example in the 1976 Release. *Id.* at 427. The Court explained that a proposal to phase out production is readily distinguishable from a "go/no go" proposal forbidding construction of a new resource. *Id.* at 428. Unlike the "no go" nuclear power plant example, a "phase out takes work day-to-day . . . with equipment manufacturers to help develop the technology needed for alternative compounds."

- 20 -

*Id.* (citation omitted). Further, phase outs take "careful planning in sensitive areas" and "expertise in technical fields." *Id.* (internal quotation marks omitted). The difference between the proposal and Du Pont's phase out schedule was only one year; nevertheless, "[t]he steps to be taken to accomplish the phase out are complex [and] the company, having agreed to the essential policy, must carry it out safely using business and technical skills day-to-day that are not meant for shareholder debate and participation." *Id.* (internal quotation marks omitted). The Court concluded that "what is at stake is the implementation of a policy, the timing for an agreed-upon action." *Id.* (internal quotation marks and citation omitted). Therefore, *Roosevelt* held "the target date for the phase out a matter excludable" under the ordinary business exclusion. *Id.*

More recently, the Third Circuit cautioned against reliance "on how [the proposal] is framed and to whom, rather than [its] substance" in determining its subject matter. *Trinity Wall Street*, 792 F.3d at 342 (alterations in original). The Court focused on the proposal's language to reject the shareholder's sweeping characterization of its subject matter as "the improvement of corporate governance over strategic matters of community responsibility, reputation for good corporate citizenship, and brand reputation[.]" *Trinity Wall Street*, 792 F.3d at 342. The proposal—linked to Wal-Mart's sale of high-capacity firearms—asked the company's board of directors to:

[D]evelop and implement standards for management to use in deciding whether to sell a product that (1) especially endangers public safety; (2) has the substantial potential to impair the reputation of Wal-Mart; and/or (3) would reasonably be considered by many offensive to the family and community values integral to the [c]ompany's promotion of its brand.

*Id.* at 327 (internal quotation marks omitted). Pointing back at the review context in the 1982 Proposing Release, the *Trinity Wall Street* Court stated that "the subject matter of the proposal is . . . its *ultimate* consequence—here a potential change in the way Wal-Mart decides which products to sell." *Id.* at 342 (emphasis in original). So, if Wal-Mart adopted the proposal, "whatever the nature of the forthcoming policy, it could (and most certainly would) shape what products are sold by Wal-Mart"—the heart of its business. *Id.* (internal quotation marks omitted).

Furthermore, although the *Trinity Wall Street* Court found that the proposal "touch[ed] the bases of what are significant concerns in our society," thereby sufficiently raising a matter of significant social policy, it nevertheless determined that it failed to "transcend" Wal-Mart's ordinary business. *Id.* at 346–51. By its reading of the 1998 Release, the "transcendence requirement plays a pivotal role in the social-policy exception calculus," because "[w]ithout it shareholders would be free to submit proposals dealing with ordinary business matters yet cabined in social policy concern." *Id.* at 347 (citation and internal quotation marks omitted).

In other words, finding that a proposal implicates significant social policy is not a dispositive inquiry.[9] *Id.*

Only "if a significant policy issue disengages from the core of a retailer's business" is it likely to transcend its daily business operations; otherwise, "shareholders perform a valuable service by creating awareness of social issues, [but] they are not well-positioned to opine on basic business choices made by management." *Id.* at 347–48. So, while the *Trinity Wall Street* Court agreed that, in an age of mass shootings and concerns about product safety, the proposal implicated a significant social policy, it concluded that "how a retailer weighs safety in deciding which products to sell [is] too enmeshed with its day-to-day business[.]" *Id.* at 348. Therefore, the Third Circuit applied the ordinary business exclusion, because "stripped to its essence, [the proposal]—although styled as promoting improved governance—goes to the heart of Wal-Mart's business: what it sells on its shelves." *Id.* at 328.

_____

[9] In her Concurrence, Judge Shwartz disagreed with the Majority's reading of the 1998 Release. Judge Shwartz posits that the 1998 Release's "transcendent" concept is interrelated to the "significant policy" concept, not independent from it. 792 F.3d at 353. To engage in an independent inquiry as to a proposal's transcendence—after determining that it sufficiently raised a significant social policy—would "practically give[] companies carte blanche to exclude any proposal raising social policy issues that are directly related to business operations" and undermine the purpose of the 1934 Securities and Exchange Act. *Id.* The Court agrees that the 1998 Release leaves interpretive space, but it adopts the Majority's reading. To except a proposal so long as it raises significant social policy would all but swallow the regulation's explicit ordinary business exclusion in strategic drafting.

- 23 -

Here, like *Roosevelt*, the dispute turns not on *if* NorthWestern should reduce the carbon intensity of its electric generation, but when and how the Company should accomplish its transition to carbon-free renewables. Indeed, Hines represents that the Company "has committed to reduce the carbon intensity of its electric generation by 90 percent by 2045 from a 2010 baseline." (Doc. 24-1 at 15.) Furthermore, there is no dispute, from the parties or the Court, that the Proposal addresses significant concerns in our society, thereby raising a sufficiently significant social policy concern. Climate change presents an intolerable and urgent global crisis. So, in this case, the question is not whether the Court agrees that coal-fired power plants, like Colstrip, contribute to the steady and devastating rise in Earth's temperatures. Instead, and analogous to *Trinity Wall Street*, the question here is whether the Proposal's resolution is too entwined with the fundamentals of the daily activities of a public utility running its business. For the following reasons, the Court thinks it is.

First, the Court finds Tosdal's argument unpersuasive that the 1976 Release "fits this case squarely" if "nuclear power plant" was replaced with "coal fired power plant" in the nuclear power plant example. (Doc. 21 at 14.) Like the proposal in *Roosevelt*, the Proposal here is not a "go/no go" request, but rather asks NorthWestern to phase out coal-fired generation of electricity from Costrip and replace it with renewable energy by 2025. (Doc. 1-1 at 2; Hr'g Tr. 27:13.) Tosdal

- 24 -

attempts to minimize the Proposal's effect, if adopted, by explaining "all that's being sought is a written commitment of some nature to stop generating at Colstrip and going to renewables . . . [i]n five years." (Hr'g Tr. 26:23–27:3.) However, like phasing out CFC production, phasing out coal-fired production at Colstrip takes work day-to-day.

Tosdal oversimplifies what the Proposal, if passed, would implicate and require of Northwestern. NorthWestern's long-term resource planning—a core responsibility of its business—involves a complex "multi-disciplinary assessment of many varied factors." Doc. 24-1 at 3. For example, Hines attests that as "a matter of physics, for the electric grid to operate reliably, there must be a balance between the amount of energy generated on the electric grid and the consumption of that energy ('load')." *Id.* at 6. For the electric grid to remain stable, NorthWestern balances generation against load "year-to-year, month-to-month, day-to-day, hour-by-hour, and minute-by[-]minute." *Id.* The importance of this balancing is reflected by NorthWestern's legal obligation to "assess[] the amount of load . . . that needs to be served over the statutorily-required 20-year planning horizon." *Id.*

Meanwhile, NorthWestern's resource planners must assess whether the Company has "adequate generating and associated transmission capacity to meet demand" by evaluating available resources. *Id.* Different generating resources

have different capacities—the measure of a resource to predictably produce
energy—and operating capabilities. *Id.* at 7. NorthWestern's resource planners
"must ensure there is sufficient capacity to meet annual peak load[.]" *Id.* Hines
goes on to explain that NorthWestern: plans for "reserve margins" when plants go
offline for maintenance and unplanned events; assesses whether "the available
electrical generation mix can reliably serve customers hour-to-hour, no matter
seasonal demand"; prepares to join an imbalance market in 2021 that requires it to
have sufficient capacity to meet the needs of the other market participants; and has
confirmed Colstrip's role in NorthWestern's efforts to mitigate its market reliance.
*Id.* at 8–13. Furthermore, acting under the statutory scheme governing public
utilities in Montana, NorthWestern developed a 2019 resource plan "weigh[ing]
the impact of its resource planning choices on the rates customers pay[.]" *Id.* at 16.
There, NorthWestern concluded that its participation in and plans to meet the
requirements of the imbalance market will enable the Company to provide
affordable and reliable energy to its customers. *Id.* at 17.

Taken together, Tosdal cannot and does not dispute that NorthWestern's
resource planning, takes "careful planning in sensitive areas" and "expertise in
technical fields." *See Roosevelt*, 958 F.2d at 428. Closing Colstrip in five years,
unlike a "no go" decision on the construction of a non-existent nuclear power
plant, would take work day-to-day with experts in a multitude of disciplines

maintaining the balance of the electrical grid, assuring compliance with state statutes and regulations, and developing adequate renewable replacements. The Proposal would shut down a significant carbon-generator two decades before NorthWestern's 90 percent carbon-reduction target date, and the steps to be taken to accomplish the phase out are complex. NorthWestern—having agreed to its essential policy—must carry it out safely using business and technical skills day-to-day that are not meant for shareholder debate and participation. *See id.* Therefore, the Court cannot "squarely fit" the Proposal into the 1976 Release's nuclear power plant example as Tosdal urges.

Next, Tosdal's attempt at abstract framing aside, the subject matter of the Proposal is its ultimate consequence. Here, the Proposal's ultimate consequence is a potential change in how NorthWestern plans to provide and provides energy to consumers. That is, if the Company adopted the Proposal, it most certainly would shape how NorthWestern goes about resource planning. And, as outlined already, resource planning lies at the core of NorthWestern's ordinary business operations.

Accordingly, because no dispute exists that the Proposal raises a significant social policy issue, the final inquiry is whether the policy "transcends" the nuts and bolts of NorthWestern's ordinary business. Here, the Court finds that, rather than disengaging from Northwestern's core business, the Proposal enmeshes itself in it.

For example, Hines explained that Colstrip plays a "critical role in the

NorthWestern system," based, in part, on its "large size of the capacity and load following power that . . . is essential to support the addition and maintenance of renewables on NorthWestern's system." *Id.* at 17–18. Additionally, NorthWestern's resource planners have determined that early retirement of "low-cost, baseload resources like Colstrip, are not in the best economic interests of its customers." *Id.* at 18. And, shutting down Colstrip by 2025 would "imperil the ability of NorthWestern to provide reliable energy during periods of peak demand." *Id.* Furthermore, Hines assured that that NorthWestern's planning includes assessing the need to retire a resource if it is unable to comply with current or future carbon emission regulations. *Id.* at 13–14.

The Proposal injects itself into all the resource planning functions that lie at the core of NorthWestern's business. It does not prescribe a lofty policy goal that the Company "remove carbon emissions from all its production." (*See* Hr'g Tr. 37:17–23.) Instead, if passed, it would require NorthWestern to "remove all carbon emissions . . . from a specific plant and to replace it with a specific type of electricity within five years." (Hr'g Tr. 37:20–23.) The Court appreciates that Tosdal performs a valuable service by creating climate awareness, but in this instance, he is not well-positioned to opine on the basic planning choices made by NorthWestern's management. In other words, the Proposal—although styled as promoting climate awareness and seeking a shift in corporate attitude—goes to the

heart of NorthWestern's business: how it plans to provide and provides reliable energy to its customers.

Accordingly, even though the Proposal raises sufficiently significant social policy issues, it fails to transcend the ordinary business operations of NorthWestern. For a policy issue to transcend the Company's ordinary business operations, it must focus on something larger than shutting down a specific plant by a specified target date. The Proposal is excludable under Rule 14a–8(i)(7).

## III.   INJUNCTIVE RELIEF

Tosdal seeks as a remedy not just a declaratory judgment, but also "a preliminary and permanent injunction enjoining NorthWestern . . . from excluding the proposal from its 2020 proxy statement and annual meeting." (Doc. 1 at 7.) However, because Tosdal's Complaint relates just to the Proposal's inclusion in the 2020 Proxy Materials, only a preliminary injunction is in play here.

A preliminary injunction is an "extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Because the Court finds that NorthWestern may properly omit the Proposal from its 2020 Proxy Materials, Tosdal's prayer for preliminary injunctive relief is denied.

## ORDER

Accordingly, IT IS ORDERED that NorthWestern's cross-motion for summary judgment (Doc. 23) is GRANTED, and Tosdal's cross-motion for summary judgment (Doc. 20) is DENIED. It is FURTHER ORDERED that Tosdal's prayer for injunctive relief (*see* Doc. 1-1 at 7) is DENIED.

Dated this __25th__ day of February, 2020.

Dana L. Christensen, Chief Judge
United States District Court